IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CRIMINAL ACTION NO. 11-83 |
| v. : | |
| : | CIVIL ACTION NO. 14-1202 |
| DONALD HELLINGER : | |

**SURRICK, J.**                                                                                                       **FEBRUARY 9 , 2015**

**MEMORANDUM**

Presently before the Court is Petitioner Donald Hellinger's Motion to Vacate/Set Aside/ Correct Sentence under 28 U.S.C. § 2255 (ECF No. 298). For the following reasons, the Motion will be denied.

**I.     BACKGROUND**

On February 10, 2011, a federal grand jury returned a fourteen-count Indictment charging Petitioner with conspiracy, in violation of 18 U.S.C. § 371 (Count 1); operating an illegal money transmission business, in violation of 18 U.S.C. § 1960 (Count 2); operating an illegal gambling business, in violation of 18 U.S.C. § 1955 (Count 3); transmission of wages and wagering information, in violation of 18 U.S.C. § 1084 (Counts 4 through 11); and international money laundering, in violation of 18 U.S.C. § 1956 (a)(2)(A) (Counts 12 through 14). (Indictment, ECF No. 1.)  Also charged in the Indictment were:  Petitioner's brother, Ronald Hellinger; Michael Weisberg; Randy Trost; Jami Pearlman; and Michele Quigley.  (*Id.*)

Petitioner entered into a plea agreement with the Government.  (Min. Entry, ECF No. 101; Plea Doc., ECF No. 102.)  The plea agreement provided that Petitioner would plead guilty to Count 2 of the Indictment and, in exchange, the Government would move to dismiss the remaining counts.  A violation of 18 U.S.C § 1960 charged in Count 2 has a statutory maximum

sentence of 60 months.  (*Id*.)  On February 28, 2012, Petitioner entered a plea of guilty pursuant to the plea agreement.  On September 19, 2012, a sentencing hearing was held.  (Sept. 19, 2012 Hr'g Tr., ECF No. 187.)  The Sentencing Guidelines called for a sentence above the statutory maximum.  (*Id*. at 45.)[1]  After considering all of the relevant circumstances, a sentence well below the statutory maximum was imposed.  Petitioner was sentenced to 36 months incarceration followed by two years of supervised release.  (Sept. 19 Hr'g Tr. 48.)  Petitioner was represented by Fortunato N. Perri, Jr., Esquire from the time of his arraignment through the time of his plea hearing.  (Pet'r's Mot. 3, ECF No. 298.)

On February 26, 2014, Petitioner filed the instant Motion to vacate/set aside/correct sentence under 28 U.S.C. § 2255.  (*Id*.)  Petitioner argues that Perri rendered ineffective assistance by failing to timely convey a linked plea offer from the Government to him and to counsel for his co-Defendants.  On June 18, 2014, the Government filed a response.  (Gov't's Resp., ECF No. 312.)  On July 2, 2014, Petitioner filed a reply.  (Pet'r's Reply, ECF No. 313.)  An evidentiary hearing was held on August 18, 2014 (Aug. 18 Hr'g Tr., ECF No. 325) and September 4, 2014 (Sept. 4, Hr'g Tr., ECF No. 332).[2]  At the August 18th hearing, Petitioner presented testimony from Perri, and from his co-Defendants, Jami Pearlman and Randy Trost.  At the September 4th hearing, Petitioner testified and presented two additional witnesses: Michael Drossner, Esquire, counsel for Ronald Hellinger; and Robert Welch, Esquire, attorney

---

[1] *See United States v. Hellinger*, No. 11-83, 2012 U.S. Dist. LEXIS 134058 (E.D. Pa. Sept. 19, 2012) (addressing objections to the presentence investigation report calculation of the Sentencing Guidelines and ultimately determining that the Sentencing Guidelines range for Count 2 was 108-135 months), *aff'd,* 538 F. App'x 211 (3d Cir. 2013).

[2] The hearing transcripts as well as exhibits submitted by the parties are on file with the Court.

for co-Defendant Michelle Quigley.[3]  The Government presented the testimony of Jeffrey Miller, Esquire, counsel for Jami Pearlman.  On October 17, 2014, at the Court's request, the parties each filed proposed findings of facts and conclusions of law.  (Gov't's Mem., ECF No. 346; Pet'r's Mem., ECF No. 347.)

## II.   HEARING TESTIMONY

Perri was Petitioner's attorney from approximately March of 2011 through April of 2012.  (Aug. 18 Hr'g Tr. 6; ECF Nos. 35, 123.)  The representation began shortly after Petitioner was arraigned, and ended after Petitioner's change-of-plea hearing.  (Aug. 18 Hr'g Tr. 6.)[4]  Perri has been an attorney for over 25 years.  (Aug. 18 Hr'g Tr. 6.)  He spent two years as an assistant district attorney, and the remaining years dedicated predominantly to criminal matters in private practice.  (*Id*. at 6-7.)[5]

On  December 14, 2011, the Government, through Assistant United States Attorney Joel Sweet ("AUSA Sweet"), extended a collective or "linked plea offer" ("Linked Offer") to Perri.  (Aug. 18 Hr'g Tr. 10, 15, 16.)[6]  The offer was made over the telephone.  (Aug. 18 Hr'g Tr. 10-

---

[3] On March 6, 2014, after a hearing, the Court filed a Memorandum and Order denying Michelle Quigley's motion to vacate her sentence under Section 2255.  (ECF Nos. 303, 304); *United States v. Quigley*, No. 11-83-06, 2014 U.S. Dist. LEXIS 29441 (E.D. Pa. Mar. 6, 2014).  The arguments raised by Petitioner in the instant Motion are nearly identical to the arguments raised by Quigley in her motion.

[4] Perri sought to withdraw as counsel after Petitioner retained another attorney to represent him during his sentencing.  (*See* ECF No. 122.)

[5] Petitioner's co-Defendants retained the following attorneys:  Ronald Hellinger was represented by Michael Drossner, Esquire; Michael Weisberg was represented by Anne Dixon, Esquire; Jami Pearlman was represented by Jeffrey Miller, Esquire; Randy Trost was represented by Peter Scuderi, Jr., Esquire; and Michele Quigley was represented by Robert E. Welsh, Esquire.

[6] A linked plea offer is also sometimes referred to as a "wired" or "global" plea offer.

11.) AUSA Sweet understood that Perri had communicated the Linked Offer to all other defense counsel in the case. (Joint Exhibit ("J. Ex.") 024.)[7]

To accept the Linked Offer, all Defendants had to plead guilty to one count of illegal gambling, in violation of 18 U.S.C. § 1955, and one count of illegal transmission of wagering information, in violation of 18 U.S.C. § 1084. (*Id*.) If the Linked Offer was accepted by all Defendants by January 10, 2012, each Defendant would receive a three-level reduction for timely acceptance of responsibility. (*Id*.) If any Defendant rejected the Linked Offer, the offer was withdrawn as to all Defendants. (*Id*.) The Linked Offer had significantly lower guideline ranges and statutory maximums than what was charged in the Indictment. (Aug 18 Hr'g Tr. 12.) Perri believed that the Linked Offer was a "very good offer" for his client because it would significantly reduce the sentencing guideline range and would lead to a lower sentence. (*Id*. at 14-15.)

### A. Communication of Linked Offer to Defense Counsel

After receiving information about the Linked Offer from AUSA Sweet, Perri conveyed it to counsel for co-Defendants. (Aug. 18 Hr'g Tr. 38-39.) Perri does not recall specifically when he shared the Linked Offer with co-Defendants' counsel; however, it was clear to him that everyone was aware of the situation. (*Id*. at 15, 24-25, 38, 49.) Perri's testimony in this regard is supported by an e-mail that he sent to Michael Drossner, Anne Dixon, Jeffrey Miller, and Bob Welsh on December 26, 2011. In that e-mail, Perri stated: "I spoke to Joel [Sweet] last week and he wanted me to pass on that the government would like to know by around the 10th of January our decision on a non-trial disposition." (J. Ex. 025.) Obviously, Counsel knew, prior to

---

[7] The parties submitted joint exhibits for the Court's consideration. They comprise the exhibits submitted by Petitioner and the Government during the hearing.

December 26, 2011, that there was a plea offer on the table with a deadline for acceptance. Nevertheless, Jeffrey Miller, Michael Drossner, and Robert Welch each testified that they first learned about the Linked Offer from a January 6, 2012 e-mail from AUSA Sweet to all counsel. (Sept. 4 Hr'g Tr. 33, 80, 82, 157.)  AUSA Sweet's e-mail, which was sent at 10:04 a.m. on January 6th, stated, "the government's plea offer and possibility of reduction [for acceptance of responsibility] expires on January 10."  (Aug. 18 Hr'g Tr. 30-31; J. Ex. 022.)  Miller responded to the email requesting additional details from AUSA Sweet.  (J. Ex. 020.)  AUSA Sweet responded by e-mail to Miller at 2:01 p.m. that the Linked Offer had been conveyed to Perri several weeks ago, and Perri had advised Sweet that he had conveyed it to Counsel.  AUSA Sweet set forth the details of the plea agreement in the e-mail.  (J. Ex. 019.)  At 4:12 p.m. on January 6th, Drossner sent the following e-mail to defense counsel:

> Based upon the Government's offer, I don't believe a meeting is necessary; instead we should each speak to our respective clients regarding the offer and their options.  Please notify me of your client's position and I will contact AUSA Sweet on or before Tuesday.
> Hopefully, I will be able to inform him that everyone wants to accept the offer, and I will then request that he prepare a proposed guilty plea agreement for each defendant.  **While nobody likes deadlines, there is no reason why we need more time to discuss this offer** (with the exception of Jeff's client but that is between him and the government).
> If possible, please don't wait until Tuesday afternoon to contact me.  Also, if you contact the government directly, please let me know so that I'm not waiting for your call/email.

(J. Ex. 023 (emphasis supplied).)

    **B.**    **Communication of Linked Offer between Petitioner and Perri**

Perri does not recall exactly when he first advised Petitioner of the Linked Offer; however, he testified that he had conversations with Petitioner about the Linked Offer between December 14, 2011 and January 5, 2012.  (Aug. 18, Hr'g Tr. 23-24.)  Perri also testified that he

remembered speaking to Petitioner on Friday, January, 6, 2012. (*Id*. at 43.) When Perri spoke to Petitioner on the 6th, Petitioner was agreeable to the Linked Offer. (*Id*.) However, Petitioner later changed his mind and advised Perri that he would not accept any offer that did not include a probation sentence. (*Id*. at 43-44.)

Petitioner testified that Perri did not communicate the Linked Offer to him prior to the New Year. (Sept. 4 Hr'g Tr. 86-87.) Petitioner stated that he first learned of the offer on Friday, January 6, 2012 when he was at a trade show in Long Beach, California. (*Id*. at 88.) Perri called Petitioner on his cell phone between 8 a.m. and 9 a.m. that morning to convey the Linked Offer. (*Id*.) On that call, Perri advised Petitioner that the deal proposed by the Government was significantly better than going to trial. (*Id*. at 89.) Perri also advised Petitioner that the Linked Offer was conditioned on acceptance by all Defendants, and that it had a deadline of January 10, 2012. (*Id*. at 89-90.) Petitioner understood the January 10th deadline to mean that all parties had to agree by midnight on January 9th. (*Id*. at 90.) Petitioner testified that he spoke to Perri again on Sunday, and advised Perri that he had spoken to his co-Defendants over the weekend and convinced each of them, with the exception of Pearlman, to accept the Linked Offer. (*Id*. at 94.) According to Petitioner, Pearlman refused to accept the Linked Offer as she was "adamant that she was going to be severed from the case." (*Id*.) Petitioner understood that Perri had doubts about whether Pearlman would in fact be severed, and if she was, whether that could occur prior to the expiration of the Linked Offer. (*Id*. at 98.)

Perri and Drossner exchanged e-mails on Sunday, January 8, 2012, about weekend discussions that they had with their respective clients concerning the Linked Offer. (J. Ex. 032.) At 4:39 p.m. on Sunday, Perri wrote to Drossner:

> I just spoke to Don for about an hour and he's done a complete about face and will not plead unless he get[s a] probation offer. I told him its suicide.

(J. Ex. 032.) Approximately 30 minutes later, Drossner responded to Perri:

> I had a great talk w Ron on Friday afternoon then he did the same . . . I'm sending Ron an email on Monday describing the offer in detail and his guidelines w[ith] plea and w[ith] trial.

(*Id*.) According to Perri, the e-mails reveal that Petitioner and his brother had a "change in heart" about the Linked Offer. (Aug 18 Hr'g Tr. 43.) Perri testified that on Sunday, Petitioner made it clear that he would not accept a plea offer that did not include a probationary sentence. (*Id*. at 43.44.) Drossner testified that he spoke with Ron and had a productive conversation about the plea arrangement, but that by the end of the conversation, Ron had reservations about the offer. (Sept. 4 Hr'g Tr. 69.)

On Monday, January 9, 2012, at 9:14 a.m., Perri sent an e-mail to Petitioner, "to confirm [their] recent conversations about the plea offer from the Government." (J. Ex. 006; *see also* Sept. 4 Hr'g Tr. 100.) The e-mail reiterates that the Linked Offer "drastically reduce[s]" the sentencing guideline range. (*Id*.) The e-mail further states as follows:

> When we spoke on Friday, you were in agreement that this was a good way to resolve the case and as of Sunday you advised me that, unless the Government agreed to probation for you, the plea offer was unacceptable. I told [you] that [] I disagreed with your assessment and the Government wouldn't agree to a sentence of probation. The information you referenced in your most recent email to me is irrelevant and has no bearing on the disposition of your case. The government wants an answer on the plea offer by the close of business on Tuesday. I'm happy to discuss this matter further with you today and tomorrow. If you chose to go to trial, please forward the remainder of the trial fee immediately pursuant to our fee agreement. I look forward to speaking with you soon.

(*Id*.; *see also* Aug. 18 Hr'g Tr. 52-53.)[8]

---

[8] Perri's reference to irrelevant information relates to Petitioner's request that Perri explore Treasury regulations and speak to an IRS agent. (Aug. 18 Hr'g Tr. 50; J. Ex. 007.)

7

Petitioner responded to Perri's e-mail approximately fifteen minutes later. (J. Ex. 005; Aug. 18 Hr'g Tr. 56.) In that response, he did not dispute Perri's summary of their conversation about the Linked Offer, or Perri's statement that Petitioner would not accept any offer without a probationary sentence. (*Id*.) Instead, Petitioner requested that Perri discuss the case with the IRS and file a motion requesting information from the Government. (*Id*.) Petitioner also wrote that "[o]nce I see that you are beginning to work on my behalf and that this isn't going to be settled prior to a trial I'll pay you the money agreed upon." (*Id*.) Despite what the e-mails state, Petitioner testified that his acceptance of the Linked Offer was never conditioned on him receiving probation, but rather that it was Pearlman that insisted on probation. (Sept. 4 Hr'g Tr. 102.) This testimony is not credible.

Petitioner sent Perri another e-mail on January 13, 2012, days after the Linked Offer had expired. (Aug. 18 Hr'g Tr. 58; J. Ex. 017.) The e-mail stated that Petitioner was "90 percent certain" that he could get all of his co-defendants to plead guilty to one count of 18 U.S.C. §1084 . . . ." (*Id*.; Aug. 18 Hr'g Tr. 58-59.) This was more beneficial to Defendants than the Linked Offer because it was for a lesser number of counts. (Aug. 18 Hr'g Tr. 59.) Petitioner never expressed any interest in attempting to resurrect the Linked Offer. (*Id*.)

    **C.**    **Rejection of Linked Offer by Pearlman**

On January 9, 2012, Miller sent an e-mail to AUSA Sweet stating that "for a variety of reasons, my client [Pearlman] respectfully declines the current plea offer." (J. Ex. 003.) Miller testified that Pearlman explicitly told him to reject the Linked Offer. (Sept. 4 Hr'g Tr. 162.) From the Government's perspective, this rejection rendered the Linked Offer terminated.

---

Petitioner believed that this information would assist him in defending against the Government's charges.

Pearlman testified that she rejected the Linked Offer after she and Miller decided that she "didn't have enough time or information over the weekend" to decide whether to accept the Linked Offer. (Aug. 18 Hr'g Tr. 74, 105.) Pearlman stated that she first became aware of the Linked Offer on Friday, January 6, 2012, and that although most of her co-Defendants talked to one another every day, she did not remember discussing the Linked Offer with any of them. (*Id.* at 72-73, 76-77.) Pearlman testified that although she is not 100 percent sure that she would have taken the Linked Offer, she most likely would have gone along with it if she "had three weeks . . . to discuss it with [Miller] and [her co-defendants] and . . . everybody thought it was going to be the best outcome . . . ." (*Id.* at 78.) Finally, Pearlman testified that she does not have any recollection of any of her co-Defendants attempting to change her mind about rejecting the Linked Offer either before or after she rejected it. (*Id.* at 96-97.)

Miller testified that, based upon Pearlman's health, her background, and her claimed innocence, he recommended that she refuse the Linked Offer. (Sept. 4 Hr'g Tr. 158.) According to Miller, Pearlman insisted that she was innocent of the charges, and as a result, she was reluctant to enter into any plea agreement. (*Id.* at 159.) Miller testified that Pearlman communicated to him that she would never even consider a plea arrangement unless probation was guaranteed. (*Id.* at 159-60.) In other words, Pearlman would only consider a plea under Rule "11c for probation." (*Id.* at 159.) Miller's testimony was corroborated by Pearlman, who stated that, at some point, she wanted assurance that she wasn't going to be in jail until she was a grandmother as a result of this case. (Aug. 18 Hr'g Tr. 76.) Miller did not give the lack of enough time to consider the plea offer as the reason for its rejection.

Petitioner believed that, with more time, he could have convinced Pearlman to accept the Linked Offer. (Sept. 4 Hr'g Tr. 103-04.) Petitioner stated that he and Pearlman were good

9

friends, and that he knew it would take her some time to come around to accepting the plea, but that he believed she would have, even if it meant she would receive time in prison. (*Id*. at 104-06.) Petitioner and Pearlman had a conversation on Sunday night, which was the night before Pearlman officially rejected the Linked Offer. (Sept. 4 Hr'g Tr. 98-99.) The call lasted approximately 43 minutes. (*Id*.) A good portion of the conversation was about the Government's plea offer. (*Id*. at 99.) At the end of the conversation, Petitioner understood Pearlman's position to be that she was going to listen to her attorney and reject the Linked Offer. (*Id*.) From Petitioner's perspective, the Linked Offer was "off the table" as of Sunday night as a result of Pearlman's position. (*Id*.)

Robert Welch, attorney for Michelle Quigley similarly understood that Pearlman "was resolute" about her refusal to accept the offer, and advised his client that Pearlman's refusal rendered the Linked Offer moot. (Sept. 4 Hr'g Tr. 80-81.) Welch knew that Pearlman was "seriously ill from cancer" and that her attorney was confident he could obtain a severance and probationary sentence for her. (*Id*. at 81.) Welch believed that Pearlman would never accept the Linked Offer. (*Id*.)

### III.     LEGAL STANDARD

Pursuant to 28 U.S.C. § 2255, a federal prisoner may move the sentencing court to vacate, set aside, or correct a sentence "upon the ground[s] that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). Relief under this provision is generally available "to protect against a fundamental defect which inherently results in a complete miscarriage of justice or an omission inconsistent with the

rudimentary demands of fair procedure." *United States v. DeLuca*, 889 F.2d 503, 506 (3d Cir. 1989).

To establish a claim of ineffective assistance of counsel, a defendant must demonstrate that the representation that he received was deficient, and that the deficiency resulted in prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A claim cannot succeed if it fails under either prong of *Strickland*. *Id*. at 697. The Supreme Court has recently held that "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Missouri v. Frye*, 132 S. Ct. 1399, 1408 (2012). Thus, representation is rendered deficient if defense counsel allows an "offer to expire without advising the defendant or allowing him to consider it . . . ." *Id*.

The Third Circuit has endorsed the Supreme Court's suggestion in *Strickland* "to consider the prejudice prong before examining the performance of counsel prong 'because this course of action is less burdensome to defense counsel.'" *United States v. Booth*, 432 F.3d 542, 546 (3d Cir. 2005) (quoting *United States v. McCoy*, 410 F.3d 124, 132 n.6 (3d Cir. 2005)). To establish prejudice "where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel." *Frye*, 132 S. Ct. at 409. In addition, defendants must "show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." *Id*. Finally, "[d]efendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law."

*Id*. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

## IV. DISCUSSION

### A. Parties' Contentions

Petitioner contends that Perri rendered ineffective assistance of counsel: (1) for failing to convey the Linked Offer to Petitioner, at all, or in a timely fashion; and (2) for failing to convey the Linked Offer to counsel for co-Defendants "(i) in a timely fashion, so as to allow the six defendants and their six lawyers to confer to the extent necessary; or (ii) accurately as to its key elements." (Pet'r's Mem. 19.) Petitioner also argues that he was prejudiced by Perri's representation because, had he received information and advice about the Linked Offer when it was conveyed to Perri by the Government on December 14, 2011, then it is "reasonably probable that he would have pleaded guilty on the terms offered by the Government, prior to the expiration of the offer." (*Id*. at 20.) Petitioner maintains that he did not learn of the Linked Offer until January 6, 2012, and that it was essential that he "know of the offer promptly, in order to have an opportunity to discuss the matter with his co-defendants and assuage any concerns or reluctance they might have had about participating in the proposed plea." (Pet'r's Mot. 2.) Petitioner asserts that if he had had more time to speak with his co-defendants, there is a reasonable likelihood that he would have been able to convince them to accept the Linked Offer. (*Id*.; Pet'r's Mem. 20.)[9] In other words, Petitioner claims that, based upon the evidence

---

[9] Petitioner also argues that Perri was ineffective because he was laboring under a conflict of interest at the time that he negotiated Petitioner's plea. (Pet'r's Mot. 3.) Petitioner is no longer pursuing this claim. (Pet'r's Reply 3-4.)

12

presented at the hearing, it was reasonably probable that Pearlman would have accepted the Linked Offer. (Pet'r's Mem. 20.)

The Government responds that Petitioner did not meet his burden in establishing ineffective assistance of counsel because (1) he failed to prove that he would have accepted the Linked Offer had he had more time to consider it, and (2) he failed to prove that his co-Defendants would have accepted the Linked Offer. (Gov't's Mem. 17.) In particular, the Government points to Pearlman's definite and express rejection of the Linked Offer, and posits that Petitioner's claim that he would have been able to convince Pearlman or the other co-Defendants to accept the offer is nothing more than sheer speculation. (*Id*. at 18; Gov't's Resp. 8-9.)

### B. Legal Analysis

As noted above, Petitioner must show that he (1) would have accepted the Linked Offer, (2) that the Linked Offer was more favorable, and (3) that the Linked Offer would have been entered without the AUSA cancelling it. Assuming that the Linked Offer was in fact more favorable, and there is no dispute that it would have been, we will address the remaining two requirements. With respect to the third requirement—that the Linked Offer would have been entered without AUSA Sweet cancelling it—Petitioner must establish that each of his co-Defendants would have accepted the Linked Offer, or that the Government would have offered the Petitioner an unwired plea. *United States v. Gaviria*, 116 F.3d 1498, 1512 (D.C. Cir. 1997);[10] *Mickens v. United States*, 257 F. App'x 461, 465 (2d Cir. 2007); *see also Quigley*, 2014 U.S. Dist. LEXIS 29441, at *12-15.

---

[10] In *Gaviria*, the defendant argued that he would have accepted the government's plea offer, rather than go to trial, had his attorney not given him incorrect information regarding the

*1. No Evidence that Petitioner Would Have Accepted Linked Offer*

We are not persuaded that Petitioner would have in fact accepted the Linked Offer had he had more time to consider it. *Mickens*, 257 F. App'x at 463. The evidence shows that Petitioner had, at the very least, four days to consider the Linked Offer. During that time, he communicated with his attorney multiple times over the telephone and over e-mail. Petitioner also communicated with his co-Defendants about the Linked Offer during that time. The details of the plea arrangement were presented to Petitioner in an e-mail. Despite all of this, Petitioner never accepted the Linked Offer, and never requested that his attorney accept the Linked Offer on his behalf.

Petitioner testified that he would have accepted the Linked Offer, and that it was Pearlman's reluctance, and not his own, that caused the Linked Offer to expire. This testimony is simply not credible. The record clearly shows that Petitioner was unwilling to accept any plea unless the Government agreed to a sentence of probation. Perri's January 9th e-mail to Petitioner clearly set forth the terms of the Linked Offer. In addition to setting forth the Sentencing Guidelines under the Linked Offer, the e-mail also explained the potential prison sentence that Petitioner faced if he decided to go to trial. Perri stated explicitly in his e-mail to Petitioner that "as of Sunday you advised me that, unless the Government agreed to probation for you, the plea offer was unacceptable." (J. Ex. 006.) In his response to Perri's e-mail, Petitioner did not object

---

Sentencing Guidelines. *Gaviria*, 116 F.3d at 1512. The Court accepted the defendant's assertion that he would have accepted the plea offer. *Id*. at 1513. However, the Court noted that because the offer was "'wired' to the offers to his co-defendants," the defendant also had to establish that "each of his co-defendants would have accepted their respective plea offers, or that the Government would have offered [the defendant] an unwired plea." *Id*. at 1512. Because there was evidence that the Government had previously accepted counteroffers and had also accepted an unwired plea from a co-defendant, the Court found that the defendant's ineffective assistance claim had merit. *Id*. at 1513. That is not the case here.

to any of these characterizations. Instead, Petitioner wrote that "I'm concerned that you took my money and never had any plan to take this case to trial." (D. Hellinger 010.) Petitioner then asked Perri to speak to the IRS and request information from the Government concerning a possible defense to the charges in the Indictment. (*Id.*) Petitioner closed the e-mail by stating that "[o]nce I see that you are beginning to work on my behalf and that this isn't going to be settled prior to a trial I'll pay you the money agreed upon." (*Id.*) This e-mail does not paint the picture of a defendant who was willing to plead guilty rather than go to trial.

The evidence and testimony certainly reveals that Petitioner's trust in his attorney was strained. Petitioner criticized his counsel in an e-mail, threatened to withhold funds, and ultimately retained new counsel for his sentencing. However, this is not evidence of prejudice. Rather, it is evidence of a strained attorney-client relationship. Perri believed that the Linked Offer was a good one, recommended that Petitioner take the offer, and made himself available in the days leading up to the Linked Offer's expiration to discuss the Linked Offer with Petitioner. Petitioner rejected Perri's advice and chose instead to focus on preparing for trial. We reject Petitioner's assertion that he would have accepted the Linked Offer if given more time.

        2.     *No Evidence that Petitioner Would Have Been Able to Convince co-Defendants to Accept Linked Offer*

In any event, even if we were to accept Petitioner's contention that he would have taken the offer, his claim fails. To establish prejudice under *Strickland*, Petitioner must demonstrate by a reasonable probability that the Government would have waived the unanimity requirement or that all of Petitioner's co-Defendants would have accepted the offer. Petitioner does not suggest that the Government would have accepted an unlinked offer, and the Government was emphatic

that the Linked Offer was contingent upon acceptance by all defendants.[11]  Instead, Petitioner contends that if he had been given more time to discuss the Linked Offer with his co-Defendants, there is a reasonable probability that he would have been able to convince them to accept it.

There is no evidence in this record to support an argument that Petitioner's co-Defendants would have accepted the Linked Offer.  *Gaviria*, 116 F.3d at 1512.  Randy Trost testified that her attorney recommended that she take the offer, but she did not recall advising her attorney to accept the offer on her behalf.  (Aug. 18 Hr'g Tr. 114-15.)  Ronald Hellinger did not testify at the hearing; however, an e-mail from his attorney demonstrates that while Ronald may have been receptive to the plea on Friday, like his brother, as of Sunday he had done an "about face" and would not accept any offer without a sentence of probation.  Michelle Quigley also did not testify at Petitioner's hearing; however, at the hearing on her Section 2255 motion, she testified that the Linked Offer "was not a good one but an offer nonetheless."  *Quigley*, 2014 U.S. Dist. LEXIS 29441, at *13.

Above all, Pearlman definitively rejected the Linked Offer.  Pearlman had an attorney.  She also had, at the very least, four full days to discuss the Linked Offer with her attorney.  She rejected the offer "for a variety of reasons," one of them being, according to her attorney, that she would have never accepted a plea that involved a prison term.  We refuse to engage in speculation as to whether Petitioner would have been able to alter a decision that was reached by Pearlman after consultation with her attorney.  *See Strickland*, 466 U.S. at 693 (noting that the defendant must "affirmatively prove prejudice"); *see also United States v. Tilley*, No. 10-691,

---

[11] In addition, the Government did not accept any counteroffers and in fact revoked the agreement minutes after it was rejected by Pearlman.

2011 U.S. Dist. LEXIS 15844, at *5 (W.D. Pa. Feb. 17, 2011) ("Speculation and conjecture are insufficient to establish prejudice.").

Moreover, Petitioner's contention that he would have been able to convince Pearlman to accept the Linked Offer is negated by the evidence in the record. Even if we accept Petitioner's testimony, which we do not, that he became aware of the Linked Offer on January 6, 2012, Pearlman did not reject the offer until January 9, 2012. In the interim, Petitioner spoke with Pearlman over the telephone on at least seven occasions. One of these phone calls was for 29 minutes and another was for 43 minutes. (J. Ex. 008-011; Aug. 18 Hr'g Tr. 90-96.) Petitioner also spoke to Pearlman on at least one occasion—for 22 minutes—after Pearlman rejected the Linked Offer. (J. Ex. 008-011; Aug. 18 Hr'g Tr. 95-96.) According to Pearlman, she was sure that she spoke with Petitioner about the Linked Offer during these calls. She does not remember Petitioner asking her to hold off on rejecting the deal. (Aug. 18 Hr'g Tr. 91, 94.) Nor does she recall Petitioner ever asking her to withdraw her rejection after it was given to the Government. (*Id*. at 96-97.) To the extent that Petitioner made any such efforts, he clearly failed to convince Pearlman to accept the Linked Offer.

Petitioner has failed to establish that he could have convinced his other co-Defendants to accept the Linked Offer. *See United States v. Anderson*, 705 F. Supp. 2d 1, 12 (D.D.C. 2010) (noting that the defendant had presented no evidence regarding his wife's willingness to accept a "wired" plea offer and that the standard of reasonable probability "becomes more difficult the more attenuated a claim is"); *see also United States v. Price*, 237 F. Supp. 2d 1, 5 (D.D.C. 2002) (concluding that the defendant established prejudice by showing that the court had "accepted comparable pleas of [the defendant's] co-defendants the following day"); *Mickens*, 257 F. App'x at 463 (holding that petitioner failed to show prejudice where two of his co-defendants refused to

17

accept the global plea offer and the offer expired).  Petitioner has not met his burden of establishing prejudice.  Accordingly, his claim of ineffective assistance of counsel must fail.

## V. CERTIFICATE OF APPEALABILITY

The Third Circuit's Local Appellate Rules instruct:

> At the time a final order denying a petition under 28 U.S.C. § 2254 or § 2255 is issued, the district judge will make a determination as to whether a certificate of appealability should issue.  If the district judge issues a certificate, the judge must state the specific issue or issues that satisfy the criteria of 28 U.S.C. § 2253. If an order denying a petition under § 2254 or § 2255 is accompanied by an opinion or a magistrate judge's report, it is sufficient if the order denying the certificate references the opinion or report.

Third Circuit L.A.R. 22.2.  Under 28 U.S.C. § 2253, a defendant seeking a certificate of appealability must "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Defendant has raised no viable claims.  No reasonable jurist could disagree with this assessment. Therefore, a certificate of appealability will not issue.

## VI. CONCLUSION

For the foregoing reasons, Petitioner's Motion will be denied.  There is no basis upon which to issue a certificate of appealability.

An appropriate Order follows

BY THE COURT:


*/s/R. Barclay Surrick*
**U.S. District Judge**